

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-24-00522-CV

**IN THE INTEREST OF J.M.B.** and J.A.B., Children

From the 454th Judicial District Court, Medina County, Texas
Trial Court No. 23-01-28129-CV
Honorable Robert J. Falkenberg, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:        Irene Rios, Justice
                Lori I. Valenzuela, Justice
                Lori Massey Brissette, Justice

Delivered and Filed: March 12, 2025

AFFIRMED IN PART; REVERSED AND RENDERED IN PART

Appellant Mother appeals the trial court's order terminating her parental rights to her children, J.M.B. and J.A.B.[1] Mother challenges the sufficiency of the evidence supporting the trial court's finding that termination of her parental rights is in the children's best interests. We agree the evidence is insufficient to support a finding that termination of Mother's parental rights is in the children's best interests and reverse that portion of the trial court's termination order.

---

[1] To protect the identity of minor children in an appeal from an order terminating parental rights, we refer to the parents as "Mother" and "Father," and we refer to the children using their initials or as "the children." *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2). Although the trial court's order terminates the parental rights of Mother and Father, only Mother appeals.

BACKGROUND

The Department of Family and Protective Services ("the Department") initially became involved in the underlying case when the children tested positive for methamphetamines at birth. Rather than remove the children, the Department referred Mother to Family Based Safety Services ("FBS") in December 2022. Mother used methamphetamines again on January 4, 2023, and the Department sought to remove the children.

On January 5, 2023, the Department filed a petition seeking emergency removal, temporary managing conservatorship of the children, and termination of Mother's parental rights. Mother engaged in services, completed inpatient drug treatment, and began living in a sober living home when the children were reunified with her pursuant to a monitored return on October 3, 2023. While at the sober living home, there were instances where Mother did not keep her room clean, did not complete her assigned chores, and smoked or vaped tobacco at the home. These were violations of the sober living home rules and, after repeated violations, Mother was informed she would be evicted from the home in December 2023. The Department's caseworker testified there were no safety concerns for the children when Mother was evicted from the sober living home. Initially, Mother took the children with her to a shelter after she was evicted. Mother testified, however, that she contacted the Department and asked the children be placed back with the foster family who cared for them before they were reunified with Mother because she "wanted them to feel comfortable[,]" in a safe environment, and with people "they were familiar with." The Department removed the children and placed them with the foster family they lived with before the monitored return.

Mother continued to work her services and the evidence is largely undisputed that she maintained her sobriety. On March 21, 2024, the foster parents filed a petition in intervention

seeking termination of Mother's parental rights. On May 7, 2024, the Department filed a motion for transitional monitored return requesting the children be placed with Mother under a transitional reunification plan. The trial court held a three-day bench trial adjudicating the merits of the foster parents' termination petition on May 9, 2024, June 3, 2024, and July 11, 2024. The Department was seeking reunification and was not aligned with the foster parents' request for termination of Mother's parental rights. The Department's motion for transitional monitored return was carried with the trial, and the trial court simultaneously heard evidence on the motion and the foster parents' petition to terminate Mother's parental rights.

The parties admitted thirty-three exhibits and the trial court heard testimony from: Matthew Schafer, the removing caseworker for the Department; Ona Powell, the Department's caseworker since July 2023; Jennifer Ferguson, a mobile case aide for the Department; Shelly Nix, a permanency specialist with the Department;[2] Misty Martinez, the Department's conservatorship worker; Cecily Miller, the program director of Fresh Start, the first sober living home Mother resided; Cecilie Mahtushquah, a supervisor at Sara's House, the second sober living home Mother resided; Rosemarie Rios, a forensic toxicologist; Marissa Baldwin, the children's speech language pathologist; Foster Father;[3] Chelsea Ashton, Mother's chemical dependency counselor; J.R., the CASA advocate; Mother; and Father.

On July 11, 2024, the trial court signed an order terminating Mother's parental rights to the children. Specifically, the trial court terminated Mother's parental rights based on statutory grounds (D), (E), (F), (P), and (R) in subsection 161.001(b)(1) of the Texas Family Code. *See*

---

[2] Ona Powell, Jennifer Ferguson, and Shelly Nix are employed by SJRC Texas Belong, a community-based care provider contracted by the Department. Nevertheless, we refer to Powell as the Department's caseworker, Ferguson as the Department's case aide, and Nix as the Department's permanency specialist because SJRC Texas Belong is a contractor on behalf of the Department.

[3] To protect the identity of the children, we refer to the foster parents as "Foster Father" and "Foster Mother."

TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E), (F), (P), (R). The trial court also found that it was in the children's best interests to terminate Mother's parental rights. *See id.* § 161.001(b)(2). Mother appeals.

### STATUTORY REQUIREMENTS AND STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

When reviewing the sufficiency of the evidence, we apply well-established standards of review. *See id.* §§ 101.007, 161.206(a); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (conducting a factual sufficiency review); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (conducting a legal sufficiency review).

"In reviewing the legal sufficiency of the evidence to support the termination of parental rights, we must 'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'" *In re J.L.B.*, No. 04-17-00364-CV, 2017 WL 4942855, at *2 (Tex. App.—San Antonio Nov. 1, 2017, pet. denied) (mem. op.) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.F.C.*, 96 S.W.3d at 266. "A corollary to this requirement is that a [reviewing] court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.*

"In reviewing the factual sufficiency of the evidence to support the termination of parental rights, we 'must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing.'" *J.L.B.*, 2017 WL 4942855, at *2 (quoting *J.F.C.*, 96 S.W.3d at 266). "A [reviewing court] should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *J.F.C.*, 96 S.W.3d at 266. "The [reviewing] court must hold the evidence to be factually insufficient if, in light of the entire record, the disputed evidence contrary to the judgment is so significant that a reasonable factfinder could not have resolved that disputed evidence in favor of the ultimate finding." *In re M.T.C.*, No. 04-16-00548-CV, 2017 WL 603634, at *2 (Tex. App.—San Antonio Feb. 15, 2017, no pet.) (mem. op.).

Further, in a bench trial, the trial court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *In re J.F.-G.*, 627 S.W.3d 304, 312, 317 (Tex. 2021). This is because "the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.) (quoting *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). We, therefore, defer to the trial court's factual determinations and judgment regarding credibility. *J.F.-G.*, 627 S.W.3d at 312; *see also In re R.R.A.*, 687 S.W.3d 269, 279 n.50 (Tex. 2024) ("Reviewing courts, however, must defer to the factfinder's judgment as to the credibility of the witnesses and the weight to give their testimony, including reasonable and logical inferences from the evidence.").

**BEST INTERESTS**

In her sole issue, Mother challenges the sufficiency of the evidence to support the trial court's findings that termination of her parental rights was in the children's best interests. The Department filed an advisory with this court stating it is aligned with Mother and has declined to file an appellate brief. The foster parents have filed the appellees' brief.

When considering the best interest of a child, we recognize the existence of a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a).

In determining whether a parent is willing and able to provide the child with a safe environment, we consider the factors set forth in section 263.307(b) of the Texas Family Code.[4] *See id.* § 263.307(b). We also consider the *Holley* factors.[5] *See Holley v. Adams*, 544 S.W.2d 367,

---

[4] These factors include:

(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child [or] the child's parents . . . ; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills . . . ; and (13) whether an adequate social support system . . . is available to the child.

TEX. FAM. CODE ANN. § 263.307(b).

[5] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement;

371–72 (Tex. 1976). These factors are not exhaustive. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* In analyzing these factors, we must focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

Evidence that proves one or more statutory ground for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 28 (holding the same evidence may be probative of both section 161.001(b)(1) grounds and best interest, but such evidence does not relieve the State of its burden to prove best interest). "A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

At the outset, we note the trial court in its oral pronouncement stated foster parents "have shown by a preponderance of the evidence several [best-interest] factors" supporting termination. "[T]he United States Supreme Court held that 'before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the [petitioner] support its allegations by at least clear and convincing evidence.'" *C.H.*, 89 S.W.3d 23 (alteration omitted) (quoting *Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982)). Due process compels the

---

(8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013).

heightened clear and convincing burden of proof "because terminating the parent-child relationship imposes permanent, irrevocable consequences." *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *see also C.H.*, 89 S.W.3d at 23 (holding termination of parental rights "is a drastic remedy and is of such weight and gravity that due process requires the [petitioner] to justify termination of the parent-child relationship by proof more substantial than a preponderance of the evidence." (quoting *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980))).

"On the other hand, a finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance-of-the-evidence standard." *J.A.J.*, 243 S.W.3d at 616. Thus, "the quantum of proof required to support a termination decision differs from the level necessary to support a conservatorship appointment." *Id.* And, while the evidence here may very well be sufficient to support the trial court's conservatorship determination, it must be clear and convincing to justify termination.

Regardless of whether the trial court's "preponderance of the evidence" recitation was a misstatement or application of the wrong burden of proof, its written order states it found termination was in the children's best interests by "clear and convincing evidence" and we review those findings. *See In re J.B.R.*, No. 04-21-00253-CV, 2022 WL 4492096, at *4 (Tex. App.—San Antonio Sept. 28, 2022, no pet.) (mem. op.) ("In civil cases, when a trial court's oral pronouncement conflicts with a written judgment, the written judgment prevails.").

Here, nearly all the material evidence presented at trial was undisputed. The parties disagree, however, whether the evidence is sufficiently clear and convincing to allow the trial court to form a firm belief or conviction that termination of Mother's parental rights is in the children's best interests.

Notwithstanding the conclusive nature of the testimony regarding Mother's actions during the case, the witnesses provided polarizing opinions on whether Mother's actions were reasonable or harmful to the children and whether Mother's parental rights should be terminated. Witnesses employed by the Department testified Mother has successfully completed her services, cooperated with the Department, and taken the necessary steps to show she can provide the children with a safe and stable home. Thus, those witnesses opined the children should be reunified with Mother pursuant to a transitional monitored return. In contrast, the court-appointed CASA volunteer and the children's attorney ad litem believe that although Mother has made significant progress, her parental rights should nevertheless be terminated because her history of drug abuse and medical decisions for the children put the children's future health in jeopardy. They believe the children's best interests would be served by terminating Mother's parental rights, which would allow the foster parents to adopt the children.

## A. Mother's History During the Legal Case

As mentioned above, the Department became involved in the underlying case when the children were born with methamphetamines in their system. Mother admitted she used methamphetamines a couple of days before the children were born and has a lengthy history of drug abuse spanning more than ten years. Initially, the Department did not remove the children but chose instead to have Mother participate in FBS services. A safety person was designated to supervise Mother's custody of the children. While Mother was receiving FBS services, she snuck out of the home to use drugs while the children were asleep. Mother did not inform the safety person that she was leaving the home, and while the children were not left at the home alone—because the safety person was present—the children were arguably left unattended because the safety person did not know Mother was gone. Mother subsequently tested positive for

methamphetamines and admitted she used drugs at a residence where the children were, but she did not use the drugs in the children's presence. As a result, the Department removed the children from the home on January 5, 2023.

Under her service plan, Mother was required to submit to a drug assessment. Mother complied and it was recommended that Mother receive inpatient drug treatment and to comply with random drug testing. Mother entered inpatient drug treatment in early February 2023, and she successfully completed inpatient drug treatment on April 5, 2023.

After her successful discharge from inpatient drug treatment, Mother immediately engaged in outpatient drug treatment. The record reflects Mother relocated to a new town to remove herself from her drug-prone environment and place herself in a new environment where she could focus on recovery from her drug addiction. While it is unclear when exactly Mother relocated, the record indicates the move occurred early in the case and before Mother began outpatient drug treatment.

Mother also transitioned to a sober living home called Fresh Start after she left inpatient drug treatment. However, Mother was evicted from Fresh Start after only fifteen days. Cecily Miller, the program director of Fresh Start, testified Mother was evicted because she violated the rules. When asked what rules Mother broke, Miller testified Mother took a nap and it was against the rules to nap during the day.[6] After Mother violated the "nap rule" three times,[7] Miller informed Mother "it was pretty clear that she was not wanting to do this, and she needed to make other arrangements." Miller testified Mother did not smoke or vape while at Fresh Start and her eviction was not due to smoking or alcohol or drug use. Miller affirmed Mother did not do anything that

---

[6] Miller also testified there was possibly a minor infraction because Mother did not make her bed.
[7] Miller's testimony is inconsistent on whether Mother violated the rules two or three times. Although it is unclear whether Mother violated the rules two or three times, Miller's testimony indicates Mother violated the "nap rule" three times.

would jeopardize her sobriety while she was at Fresh Start. According to Miller, Mother was evicted from Fresh Start because she had a generally defiant and lackadaisical attitude.

When Mother was evicted from Fresh Start, she called her drug recovery coach for help finding a new place to live. Mother then moved to another sober living home called Sara's House.[8] Mother maintained her sobriety, continued to engage in her services, and continued with her outpatient drug treatment while living at Sara's House. Mother was successfully discharged from outpatient drug treatment on August 1, 2023. On October 3, 2023—and while she was still living at Sara's House—the children were placed with Mother pursuant to a monitored return. Powell testified Mother's room at Sara's House was clean and safe for the children. However, Mother's living conditions began to deteriorate when she stopped taking her bipolar medication. Powell testified she received a report from Sara's House that Mother was "either not bathing the children [every day] or [she was] bathing them in the sink." Powell stated there were no actual safety concerns for the children when they were in the monitored return.

Cecilie Mahtushquah, a supervisor at Sara's House, corroborated Powell's testimony. According to Mahtushquah, Mother never put the children in danger; however, she was concerned for the children's welfare because Mother would not change the children's clothes even when there was food on them, and sometimes the children smelled. Mahtushquah stated that although there were "a few times" employees of Sara's House and other ladies living at the home stepped in to bathe the children, Mother was always appreciative when she received help bathing the children. Mother received an infraction on May 21, 2023 for vaping in and around the house, leaving dirty

---

[8] There was no testimony identifying the date Mother moved to Sara's House. Powell testified Mother was already living at Sara's House when she was assigned the case in July 2023, and the infraction report admitted into evidence shows Mother received an infraction from Sara's House as early as May 21, 2023. However, the testimony of all the witnesses indicates Mother moved into Sara's House shortly after or possibly even immediately after she was evicted from Fresh Start.

dishes out, leaving crumbs on the counter, and because Mother would sometimes fail to do her daily chores. Mahtushquah also testified that Mother used profanity towards her drug counselor. Mother was required to enter into a behavior contract agreeing she would not use profanity with Sara's House staff and acknowledging breach of the behavior contract would lead to eviction from the sober living home. The behavior contract, which was admitted into evidence, was signed on June 1, 2023, and Mahtushquah testified this occurred before Mother made significant behavioral progress at Sara's House. On June 8, 2023, Mother received another infraction for failing to do her daily chores, and, on August 7, 2023, Mother received an infraction for vaping in the sober living home. After each infraction, Mother agreed to work on her compliance with the house rules.

Mahtushquah stated Mother's lack of hygiene and lack of cleanliness for herself and the children was a symptom of her depression. According to Mahtushquah, Mother initially had not been taking her antidepressant medication. Mother testified she stopped taking her medication while she was at Sara's House because she felt "fine." However, when Mother got overwhelmed, she began neglecting her own hygiene and the children's hygiene. Mother later discovered through counseling that she initially felt fine because she had been taking her medication, and it was working, but she needed to continue to take her medication. Mother testified she followed the counselor's advice and is currently taking her medication and she intends to continue taking her medication. Mahtushquah testified Mother began taking her medication while she was at Sara's House, corroborating Mother's testimony. On November 27, 2023, Mother entered into a behavior modification agreement with Sara's House where she agreed to work on the children's and her hygiene, complete chores, and take her prescribed medication.

Mahtushquah subsequently discovered Mother vaping in a room when one of the children was present. According to Mahtushquah, vaping around the children was a violation of the trial

court's order and was grounds for eviction from Sara's House. Mother was given two weeks to find a new place to live, but she did not make arrangements to move out of Sara's House. Mother was evicted from Sara's House in December 2023, and she had nowhere to live.

Despite the troubles Mother experienced at Sara's House, it is worth repeating that Powell and Mahtushquah opined the children were never in danger while they were in Mother's care at the sober living home. Further, Mahtushquah testified Mother was "really trying" to parent the children, the children were very bonded to Mother, and Mother met the children's needs—including their medical needs. Finally, Mahtushquah opined Mother's parental rights should not be terminated because of the poor hygiene she exhibited during a portion of her time at Sara's House.

After her eviction from Sara's House, Mother took the children with her to a shelter. When asked why Mother did not keep the children in the shelter with her, Mother replied she wanted the children to be reunited with the foster parents so they would be with familiar people in a safe, comfortable environment.

Powell testified the children were removed from the monitored return and placed again with the foster parents in December 2023 because Mother was evicted from Sara's House. Mother began leasing an apartment in January 2024, and Powell confirmed that Mother was still living at the apartment at the time of trial. Powell testified Mother works two part-time jobs, got her driver's license reinstated, acquired a vehicle, and has maintained financial and housing stability since her eviction from Sara's House. Misty Martinez, a conservatorship worker for the Department in the region that Mother lives, corroborated Powell's testimony, stating Mother has maintained stable employment and has appropriate transportation.

Although there were some issues that arose at the sober living home, none of those issues were drug related, and Mother has shown stability since she entered inpatient drug treatment in February 2023. The record reflects Mother obtained housing and employment and has continued a stable lifestyle after she was evicted from Sara's House. All the witnesses testified their interactions with Mother have indicated she has maintained her sobriety since February 2023. Mother also continued to attend visits with the children, and Powell testified Mother has addressed all the Department's concerns. Accordingly, on May 7, 2024, the Department filed a motion for transitional monitored return seeking to reunify the children with Mother. As mentioned above, the trial court carried the motion for monitored return with the trial and simultaneously heard evidence on both the motion and the trial on the merits.

## B. Application of the Holley Factors

### i. Desires of the Children

The children were approximately eighteen months old at the time of trial and were too young to express their desires. "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.M.G.*, 608 S.W.3d 51, 57 (Tex. App.—San Antonio 2020, pet. denied).

Here, the trial court heard evidence that the children are bonded with their foster family and are well-cared for by them. The children call Foster Father, "Dad" or "Dada," and they call Foster Mother, "Mom." The children are also bonded with the foster parents' young biological child.

However, the evidence conclusively established that Mother attended nearly every visit with the children. Mother was granted virtual visitation twice a week and in-person visitation

twice a month. Because Mother lived approximately two hours away from the foster parents, Mother was required to drive for an hour to a central meeting point to attend visitation. The testimony at trial established that Mother consistently made this drive and attended the in-person visits. The only testimony regarding a missed visit pertained to a visit that was cancelled by the Department through no fault of Mother. Ona Powell, the Department's caseworker, testified Mother is not a stranger to the children and they do not cry when they are handed to her. The children are comfortable around Mother and they seem happy with her during the visits.

Several witnesses testified the children are bonded with Mother. Powell testified: "[I]t's very clear that [Mother] has a bond with her children. She's very delicate with them. She's very patient with them, and I do believe she loves her children." Powell continued, the children know Mother's voice, they know her face, they reach for her, and they listen to her "as much as a [child their age] can listen to anyone."

Chelsea Ashton, Mother's drug counselor, testified the children "definitely love their mom" and "they are bonded with her . . . in a strong emotional way." She stated anytime she was around Mother with the children, the children were "glued" to Mother, climbing all over her, and "wanted to be in contact with her."

Because there was no evidence presented on this factor—and considering the undisputed evidence regarding the children's bond with Mother—this factor does not support the trial court's best interest determinations.

ii. *Emotional and Physical Dangers to the Children Now and in the Future*

The Department's primary concern at removal was Mother's drug addiction and the danger it posed to the children. Powell testified the Department's goal in this case was for Mother to gain sobriety and the parenting skills necessary to raise the children so they could be reunified with

Mother. Within a month of the children's removal, Mother went to inpatient drug treatment. The trial court heard testimony from several witnesses that Mother has maintained sobriety since she checked into inpatient drug treatment. Powell testified Mother successfully completed her service plan requirements to attend Narcotics Anonymous ("NA") meetings and was continuing to attend NA meetings weekly or as needed as part of her recovery plan.

Mother was subjected to random drug testing throughout the case, including weekly tests while she was living at Fresh Start. Powell stated, with one exception, there were no concerns with the results of the random drug tests throughout the case. Powell testified that Mother tested positive on a nail-bed drug test on February 27, 2024.[9] Mother denied using drugs, and Powell stated she was shocked that the nail-bed drug test was positive because all other drug tests were negative.[10] Mother was subsequently sent to take a hair and urine test that were both negative for drugs.[11]

Rosemarie Rios, a forensic toxicologist at the United States Drug Testing Laboratories, testified regarding Mother's positive nail-bed drug test. Rios testified a nail-bed drug test will show substances in Mother's system for approximately four to six months. Rios, an expert witness, stated the test indicates that the methamphetamines in Mother's system came from environmental exposure because the metabolite, amphetamine, was not present in Mother's system.[12] Rios confirmed this environmental exposure could have occurred any time within the six months prior to February 27, 2024, the date the test was conducted. Rios stated Mother would have to be

---

[9] The results of the nail-bed drug test were admitted into evidence.

[10] Powell stated Mother was also surprised by the positive test. We recognize there may not be much probative value in Mother's self-serving statement; however, several witnesses testified Mother was open and honest about her drug use prior to removal and throughout the legal case.

[11] Powell stated Mother did not have enough fingernails for a second nail-bed drug test.

[12] Rios testified the metabolite could have been in an amount below the testing threshold and could not completely rule out the possibility that Mother ingested the drug. However, Rios repeatedly stated later in her testimony that "[t]he only thing [she] can specify to this test is that the individual was positive for environmental exposure to methamphetamine" and that she "can only say environmental exposure can cause this."

persistently exposed to methamphetamines to produce a positive result from environmental exposure. According to Rios, one exposure to a high concentration of methamphetamines could cause the positive test, but it is more likely that Mother was repeatedly exposed to lower doses of methamphetamine. Rios agreed someone could have repeated environmental exposure to the drug without knowing it. For example, if the person frequently contacted furniture that contained the substance, it could cause the persistent exposure that would trigger a positive result. Rios also could not exclude persistent exposure to the skin of other people using drugs, such as people in Mother's NA meetings or at the sober living home, as a cause for the positive result.

Notwithstanding the positive nail-bed drug test results, Powell opined Mother has complied with her service plan's requirement to remain drug free and has achieved the service goal of attaining sobriety. Powell stated, other than the nail-bed drug test, she has no reason to believe Mother has used drugs since she entered inpatient drug treatment and Powell has never suspected drug use during the time she was assigned to the case. Martinez agreed Mother has not given her any reason to believe she relapsed into drug use in the year Martinez was working with Mother.

Mother tested negative on a hair and urine test six days before trial commenced.[13] The trial resumed approximately one month after the first day of trial. During the recess, Mother continued to drug test weekly, and Powell testified when the trial resumed that there were no concerns with the results of the drug tests.

As mentioned above, Mother testified her sobriety date is February 7, 2023. Nothing in the record contests Mother's testimony. Even the positive nail-bed drug test establishes that Mother did not ingest methamphetamines; rather, the very low amount of methamphetamine that showed up on the test was due to environmental exposure to the drug. While this evidence

---

[13] The results of these tests were also admitted into evidence.

indicates Mother was somehow exposed to the drug, it does not establish that Mother was using drugs. We recognize this positive nail-bed drug test showing environmental exposure to methamphetamines may weigh in favor of termination because it indicates Mother was around an illegal substance that she has previously abused; however, this one positive drug test showing Mother was environmentally exposed to methamphetamines stands in isolation against the undisputed evidence that Mother has maintained her sobriety throughout the legal case.

Powell confirmed Mother has achieved sobriety and the children should be returned to Mother pursuant to a transitional monitored return so the Department can continue to observe Mother's ability to parent the children. Mother acknowledged that she has tried and failed to achieve sobriety in the past. When asked what was different about this time, Mother responded that she moved to a new town and "got away from everybody . . . that was using." Mother continued: "I've completely changed my life around since then." Mother stated she continues to work through the steps of recovery in her NA meetings, has identified the triggers that caused her to use drugs in the past—such as past trauma and grief—and recognizes those triggers do not justify using drugs again. She also stated she has begun the process of dealing with her past traumas and letting go of those traumas. She expounded that she is surrounded by a strong support system consisting of her friends, her NA community, recovery coaches, and people she has met in her new town.

Ashton, Mother's drug counselor, corroborated Mother's testimony. When Mother was in inpatient drug treatment, Ashton would meet with her for individual drug counseling for at least one hour per week. They would also meet daily for a short period of time and then would interact three-to-four times per week in group counseling sessions. Ashton testified Mother would "self-medicate" in the past rather than seek out mental health services. The main focus of counseling

sessions was on Mother's drug abuse and mental health to ensure Mother was addressing both. Ashton stated Mother was able to "fully detox." Once Mother was fully detoxed and her mind was cleared, Ashton stated they were able to engage in mental health services and start treating Mother's depression. According to Ashton, Mother was able to identify some of her triggers for previous relapses and was able to work through relationship issues and past trauma.

In Ashton's professional opinion, Mother has made significant progress in maintaining her sobriety. At first, Mother did not believe she had a problem and told Ashton that people should stay out of her business. But as Mother progressed in her recovery, she realized she did have problems that needed to be addressed. According to Ashton:

> [Mother] identif[ied] what those problems were and how she and her kids needed to have a better life, and what that would [look] like and [what] that would include. . . . [T]o start building towards that and choose things like sober living as opposed to returning to San Antonio, choosing to stay in a completely different community, choosing to go to sober living. You know, working towards having to support herself instead of relying on somebody else. Changing her environment totally. I mean, there were a lot of changes that she chose to make in order to pursue having that better life for herself and her children.

Ashton stated Mother still checks in with her at least a couple of times each month, and Mother calls Ashton when she makes progress or when she is frustrated or worried. Ashton opined that everything Mother is doing indicates she is maintaining her sobriety—she reaches out to her support system, goes to NA meetings, maintains stable employment and housing, and reaches out or asks for help when she is having a difficult time. Finally, Ashton testified Mother's sober support system is available to her indefinitely.

Even J.R.—the CASA Advocate who opined that Mother's parental rights should be terminated—stated she believed Mother has addressed her drug issues. J.R.'s concerns were not related to Mother's drug issues. Instead, J.R. stated she was concerned that Mother is unable to safely parent the children; however, this statement is conclusory because it is not supported by

facts in the record. *See In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) (holding conclusory testimony does not amount to more than a scintilla of evidence). When asked what actions Mother has taken to support J.R.'s conclusion, J.R. stated she is concerned with Mother's parenting style and focused on Mother's past behavior. Specific to the past behavior, J.R. stated Mother should not have been evicted from Sara's House and this causes J.R. concern that Mother will not be able to provide a safe and stable home for the children. J.R. admitted, however, that Mother has maintained stable housing since she was evicted from Sara's House and conceded Mother has made significant changes since January 2023.

J.R. also stated she was concerned about Mother vaping around the children. This is a valid concern; however, considering all the evidence, we do not believe it is enough to form a firm belief or conviction that Mother will endanger the children. Of course, there was testimony that Mother smoked during her pregnancy and continued to smoke and vape while living at Sara's House. Mother acknowledged smoking or vaping around the children was not good for their lung condition. Although it was not part of her service plan, the trial court ordered Mother to take a "smoking-sensation class" and "a class that discusses the effects of smoking on babies in utero." Mother complied with the trial court's order and successfully completed the classes. Powell stated that Mother no longer smokes tobacco. Mother admitted that she still vapes "a little" but stated she is trying to quit. She testified she does not vape inside her apartment and knows that vaping has a negative effect on the children. Powell confirmed that Mother understands she cannot vape around the children.[14]

---

[14] We would be remiss if we did not acknowledge Mother's accomplishment in conquering her addiction to methamphetamines and moving toward her current goal to quit vaping. Acknowledging the effect methamphetamine has had on the children of this State, Chief Justice Blacklock aptly stated: "If we could rid our society of the scourge of these drugs, the benefit to the children of Texas—particularly the poorest and most vulnerable children—would be incalculable." *See In re R.R.A.*, 687 S.W.3d 269, 282 (Tex. 2024) (Blacklock, J., dissenting). Although the evidence shows that Mother should not vape around the children, it is difficult to ignore the fact that she is trending in the right direction and has made substantial progress on her journey to recovery.

*iii.    Emotional and Physical Needs of the Children Now and in the Future*

The children have a chronic lung condition and are susceptible to respiratory and ear infections. The trial court heard testimony that the children have had issues with upper respiratory viruses and should be given breathing treatments as needed, though the children are not required to be on oxygen.

There was testimony that the children also suffer from silent aspiration. Marissa Baldwin, the children's speech language pathologist, testified aspiration occurs when food or liquid goes into the children's airways. Baldwin explained when food or liquid go into the airway, a child normally coughs and shows symptoms of aspiration. With silent aspiration, a child does not show any physical signs of aspiration. Baldwin stated silent aspiration can cause pneumonia, chronic lung disease, and repeated upper respiratory infections. To help alleviate silent aspiration, the children were prescribed thickener to be added to liquids they drink. The thickener slows the speed of liquid going down the esophagus, allowing the children's muscles sufficient time to close off their airways to prevent the liquid from going into their lungs. The children also receive neuromuscular electrical stimulation to strengthen the muscles and increase the organization of the muscles.

There was testimony indicating Mother may not be able to properly care for the children's medical conditions because she does not think the children are as sick as she has been told, Mother may not take their compromised health seriously, and Mother ceased giving the children the thickener when they were in her care. The trial court expressly stated in its ruling that Mother "is still not reacting to the children's medical needs appropriately after over a year of help and support" and that the trial court is "not convinced nor does the [trial court] find [Mother] . . . credible that [she] will appropriately address those issues in the future without constant supervision." A review

of the record, however, shows the trial court's findings are contrary to the undisputed evidence presented at trial.

First, Powell testified about conflicting medical opinions on whether the children should be on the thickener. Mother's decision to take the children off the thickener was based on the advice of the pediatrician that provided care for the children when they were living with Mother during the monitored return. Mother provided a letter for each child from the pediatrician stating that the children were "taken off of thickened feeds" after consultation with the pediatrician and based on improvement. The letter further stated that the children were "to continue working with speech therapy and adjust feeds based on clinical course." The letters were admitted into evidence. The family code expressly states evidence that a parent sought a medical opinion from more than one medical provider relating to the child's medical care does not constitute clear and convincing evidence that termination of the parent-child relationship is in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(c)(6). Here, Mother's decision to discontinue the thickener was based on a second medical opinion and is a legally insufficient reason to support the trial court's best interest findings.

Moreover, Powell testified she was not aware of any negative medical effects from pulling the children off the thickener. And, although Baldwin testified the children should remain on the liquid thickener, she also testified that the goal is to wean the children off the thickener. The letters from the children's pediatrician show that the pediatrician was attempting to wean the children off the thickener based on their improvement. Thus, Mother's decision to take the children off the thickener, in consultation with the children's pediatrician, was an effort to work towards Baldwin's stated goal: to wean the children off the thickener.

Further, nothing in the record indicates that Mother would not provide for the children's medical needs. To the contrary, Powell stated Mother has a plan to ensure continuity of medical care should the children be returned to her, and she believes Mother will follow medical advice despite her belief that the children aren't as sick as she has been told.

On appeal, the foster parents argue the trial court's termination order should be affirmed because Mother minimizes the severity of the children's health issues. However, the following exchange between the foster parents' counsel and Mother at trial highlights Mother's dilemma when it came to the children's health:

Q:      What is your understanding of what's going on with their swallowing issues?

A.      That they are aspirating I guess.

Q.      What do you mean you guess?

A.      Because the doctor that I took them to here said that they weren't aspirating, and the doctor that they took them to over there says that they are, so . . . .

Q.      Okay. Did you ever consult with any of the children's doctors that they were seeing while in the care of the [Foster Parents]?

A.      How can I do that? I don't—

Q.      Well --

A.      They don't tell me of when they're going to the doctor.

Q.      Ma'am, that's—that wasn't my question. Nonresponsive. Have you ever consulted with any of the children's specialists that they see while in the care of the [Foster Parents]?

A.      No.

Q.      Okay. You've never consulted with the children's pulmonologist?

A.      No. Only -- no.

Q.      You think it's important for them to see a pulmonologist? I'm sorry. Go ahead.

A.      Yes.

**Q.** Why?

**A.** Because they do have—they have lung issues.

**Q.** What type of lung issues?

**A.** Chronic lung disease.

**Q.** What does that mean to you, []?

**A.** That they have lung issues. They have—they have—their lung tissue isn't as good as it's supposed to be. I don't really know.

**Q.** Okay. Why don't you know, []?

**A.** 'Cause I'm not a medical professional.

It is clear from this testimony that Mother recognizes the children have medical issues that need to be addressed. Mother reasonably calls into question the severity of the medical issues based on the second opinion from the pediatrician that advised pulling the children off the thickener. Nothing in Mother's testimony indicates she will not care for the children's medical needs. Rather, Mother's testimony indicates that she will rely on the advice of medical professionals and act accordingly. Mother's skepticism of the severity of the children's medical conditions are further compounded by the fact that she would inquire about the children's medical appointments but would not receive information so that she could attend the appointments and be informed about the children's medical care. According to Mother, she was only notified and allowed to participate in one pulmonologist appointment while the children were in the foster parents' care, and she did participate by phone in that appointment.

Powell testified that although Mother may have minimized the severity of the children's health issues, Mother took J.A.B. to the doctor eight times—including one visit for a swallow study—and took J.M.B. to the doctor four times and scheduled a swallow study for J.M.B. during the two-month monitored return. J.A.B.'s swallow study showed episodes of flash laryngeal penetration with no aspiration. Although Mother scheduled a swallow study for J.M.B., the

children were removed before the appointment. Mother also scheduled appointments with a speech therapist during the monitored return. Martinez described a time she visited Mother during the monitored return period. Martinez stated the children had hand, foot, and mouth disease, but Mother had already taken the children to the doctor and she "was on top of it." Citing Mother's active role in seeking medical care for the children during the monitored return, Powell opined Mother was meeting the children's medical needs when they were in her care.

Finally, J.R.—the CASA advocate—expressed concerns that Mother would not provide the children with breathing treatments when needed because Mother told J.R. that she felt the breathing treatments made the kids worse. However, this concern is contrary to the testimony of several witnesses who stated they believed Mother was meeting the children's medical needs. Furthermore, Foster Father testified the children are on albuterol breathing treatments as needed and, on the current treatment plan, the children do not require as many breathing treatments. And Ferguson—the Department's mobile case aide—testified she never saw the children struggle to breathe during the two-hour visits even when the children were running and playing on a playground, and she never saw any indication that the children needed the breathing treatments.

While it is the trial court's purview to assess the credibility of witnesses and assign the proper weight given to their testimony, the trial court's inference that Mother would not care for the children's medical needs is not based on the evidence and is therefore an unreasonable inference.

The trial court heard testimony that Mother is financially stable and has stable housing and reliable transportation. At the time of trial, Mother was working two part-time jobs. Although her work hours extended into the night, Mother has already made plans with one of her employers to transition to a full-time day job while the children will be in daycare. Mother has identified a

daycare for the children and spoken with the daycare about enrolling the children. Powell testified Mother has clothes, cribs, diapers, and the children's basic necessities in her apartment. Mother testified she will continue the children's medical care with local providers: the children will continue to see the pediatrician she took them to during the monitored return, and she has identified a local speech therapist and knows there is a local pulmonologist that the children can see if they are returned to her. Mother stated she plans to take the children to the pediatrician to get a referral to the pulmonologist and speech therapist. In the meantime, Mother stated she would continue to take the children to see their current specialists until she can get them into an appointment with local specialists in her area.

iv. *Parental Abilities*

While Powell testified she received reports that Mother did not keep her room clean or complete chores at Sara's House, she also stated that Mother is capable of keeping a clean living space and, when Powell visited Mother at Sara's House, her room was clean and safe for the children. Powell also testified that many of Mother's poor hygiene choices at Sara's House were due to her failure to take her medication. The testimony was undisputed that Mother is taking her medication and intends to continue taking her medication.

Powell testified Mother would get overwhelmed with the twins in the early months following removal; however, she opined Mother is no longer overwhelmed when caring for the children. In the most recent visit preceding the first day of trial, Powell stated Mother was able to feed and care for both children and only asked for help to watch one child while she took the other one to the restroom. Martinez confirmed Mother can adequately care for the children's needs.

Initially, Mother did not supply snacks for the children at visits when she was told the children had already eaten. After Mother was told the children have fast metabolisms and will get hungry during the visits, she began providing snacks for the children to eat during the visits.

According to Powell, Mother rectified every concern brought by the Department. Further, she believes Mother has applied parenting skills she has learned to her interactions with the children. Powell testified Mother was very proactive after she received correction from the Department. Powell stated: "[She would not] have to prompt [Mother] to bring diaper bags, to schedule the visits where she wanted to visit[,] . . . to take the children to the bathroom or clean the children up. [Mother] was proactive in doing all of that and bringing the supplies they needed."

Jennifer Ferguson, the mobile case aide for the Department who supervised most of the visits between Mother and the children, expressed a concern. Ferguson opined Mother had a hard time keeping up with the children when they would run off. She explained that during one visit one child ran off in a busy parking lot, and Ferguson had to step in to help Mother with the children. Ferguson described another time where one of the children tried to run out and into the parking lot at a McDonald's, and a stranger stepped in to keep the child from running out the door. This can hardly be clear and convincing evidence that Mother is unable to parent the children. Ferguson testified that Mother's struggle to keep up with the children and her reliance on a stranger when one of the children ran away from her does not justify termination of Mother's parental rights. We agree.

Moreover, Ferguson advised Mother to bring a double stroller to visits to help manage both children. While there was some resistance early in the case, Ferguson testified that Mother began bringing the double stroller to later visits and was able to manage the children more effectively.

On the second day of trial, Ferguson was very critical of every parenting decision Mother made during visits. Notwithstanding Ferguson's critical testimony, she nevertheless agreed there was no reason to terminate Mother's parental rights and did not have any concerns with the way Mother interacted with the children.[15] Ferguson was recalled on the third day of trial to describe a visit that occurred between the second and third day of trial. Ferguson testified the visit went well. Mother bought the children lunch and brought toys and diapers for the children. Ferguson stated Mother was attentive to the children and she did not see any of the concerns she described on the second day of trial.

v.    *Programs Available to Assist the Parent*

Mother's service plan, which was admitted into evidence, required Mother to take a parenting class, attend all visits with the children, participate in a psychosocial evaluation and follow recommendations, participate in individual counseling, develop an adequate social support system, and take a drug assessment and follow all recommendations. Following the drug assessment, Mother was required to successfully complete inpatient drug treatment. Upon successful completion of inpatient drug treatment, Mother was required to engage and successfully complete outpatient drug treatment and transition to a sober living home. Mother was also required to attend NA support meetings and to submit and pass random drug tests.

Shelly Nix, the Department's first caseworker assigned to Mother's case, testified Mother was compliant with her service plan and cooperative with the Department during the time she was assigned to the case. Powell testified Mother was also compliant with her service plan when she was assigned to the case. According to Powell, Mother has since successfully completed her

---

[15] Ferguson stated she was concerned that Mother would pick the children up by their forearm at visits that occurred early in the case. Ferguson asked Mother not to pick the children up by their forearm. While Ferguson testified there was some resistance from Mother early in the case, Mother later followed Ferguson's advice and rectified the concern at later visits.

services and has achieved the goals of her service plan. Powell reiterated that Mother has addressed her substance abuse issues and achieved the service plan goal of sobriety. Martinez stated she is willing to check on Mother and the children every week if necessary for the court to order a monitored return.

vi.     *Plans for the Children*

The Department seeks to reunify the children with Mother pursuant to a transitional monitored return. Foster Father testified that he and Foster Mother want to adopt the children if Mother's parental rights are terminated. In either situation, the children would find permanency. Although this factor appears neutral, we are mindful of the strong presumption that the children's best interests are served by preserving the parent-child relationship. *See R.R.*, 209 S.W.3d at 116; *see also In re M.S.*, 115 S.W.3d 534, 548–49 (Tex. 2003) (reiterating the State's interest in protecting the welfare of the child must initially manifest itself by working toward preserving the familial bond, rather than severing it, and only shifts to establishing a safe, stable, environment for the child elsewhere once it is clear that the parent cannot or will not provide that environment (citing *Santosky*, 455 U.S. at 766–77)).

vii.    *Stability of the Home*

Mother's service plan states Mother was entirely financially dependent on Father prior to removal. Powell testified Mother is independent and no longer reliant on Father to meet her needs. The trial court heard testimony that Mother moved away from Father and the environment that ensnared her into drug addiction. Mother has achieved financial stability and leases a two-bedroom apartment. Powell was able to conduct a virtual observation of Mother's apartment. She stated Mother has cribs for the children that are placed in the master bedroom, and Mother slept in the second bedroom. The apartment was equipped with child-proof safety devices such as latches

for cabinets and drawers, devices to keep the children from opening doors, and covers for electric outlets and light fixtures. Powell was not concerned about the safety of Mother's home. Martinez testified she has been to Mother's apartment, and it is appropriate for the children. Martinez corroborated Powell's testimony and stated there is a room for the children to share and Mother has beds and toys for the children. She also confirmed Mother has baby-proofed the cabinets and electrical outlets. Martinez did not see anything inappropriate at Mother's apartment and testified there was no alcohol or drug paraphernalia in the apartment.

viii.    *Acts or Omissions of the Parent Which May Indicate the Existing Parent-Child Relationship is not a Proper One and Any Excuses for the Acts or Omissions*

As mentioned above, Mother completed all her services and achieved the goals of the services, addressed the Department's concerns, and attended all visitation with the children. Mother's decision to take the children off the thickener was based on a second medical opinion and is legally insufficient to support termination.

## C.  Application of TEXAS FAMILY CODE § 263.307(b) Factors

i.    *Child's Age and Physical and Mental Vulnerabilities*

As mentioned above, the children were eighteen months old at the time of trial. There was evidence regarding the children's physical vulnerabilities that is thoroughly discussed in the physical and emotional needs section above. However, as explained above, none of this evidence weighs in favor of termination.

ii.    *Frequency and nature of out-of-home placements*

The children were removed in January 2023 due to Mother's drug use. They were returned to Mother pursuant to a transitional monitored return in October 2023. Mother testified when she was evicted from Sara's House in late December 2023, she sought to have the children placed back with the foster parents so they would be in a safe, comfortable environment with familiar people.

Although this resulted in a second removal, Mother's actions show that she can put her children's needs above her own desires. The foster parents would not even have standing to intervene had Mother simply kept the children with her in the shelter until she was able to obtain her apartment in January 2024;[16] however, Mother selflessly put her children's comfort and safety above her own desire to keep them with her. No evidence disputes Mother's testimony in this regard, and the evidence conclusively establishes that drug use was not the reason for the second removal. While we recognize the children were removed from Mother twice, Mother's actions and the nature of the second removal weighs against termination.

### iii.  *Magnitude, Frequency, and Circumstances of Harm to the Child*

Mother admitted that smoking and using drugs during her pregnancy may have caused many of the children's medical issues. Mother testified she regrets not taking better care of herself during her pregnancy. This factor may weigh in favor of termination. However, the trial court heard evidence that Mother has addressed the concerns that led to the harm inflicted on the children.

### iv.  *Whether the Child Has Been the Victim of Repeated Harm after the Initial Report and Intervention by the Department*

No evidence was presented on this factor other than the alleged harm caused by Mother's medical decision to discontinue administering the thickener, which we have already concluded is legally insufficient to support termination because Mother acted in accordance with a second medical opinion from the children's pediatrician.

---

[16] "An original suit may be filed at any time by . . . a person who is the foster parent of a child placed by the Department of Family and Protective Services in the person's home for at least 12 months ending not more than 90 days preceding the date of the filing of the petition[.]" *See* TEX. FAM. CODE ANN. § 102.003(a)(12).

*v. Whether the Child is Fearful of Living In or Returning to the Child's Home*

The trial court heard testimony from several witnesses that the children are very attached and very bonded with Mother, indicating they are not fearful of returning to Mother's home.

*vi. The Results of Psychiatric, Psychological, or Developmental Evaluations of the Child, the Child's Parents, Other Family Members, or Others Who Have Access to the Child's Home*

Following Mother's psychosocial evaluation, it was recommended that Mother engage in individual counseling. The trial court heard testimony that Mother complied and was still engaged in individual counseling at the time of trial.

*vii. History of Abusive or Assaultive Conduct*

Powell testified domestic violence is not a concern for Mother.

*viii. History of Substance Abuse*

As mentioned above, Mother has a long history of substance abuse. However, with the exception of the nail-bed drug test, the evidence shows that Mother has overcome her addiction and achieved sobriety. When asked what is different with this attempt to achieve sobriety, as opposed to her previous failed attempts, Mother testified she has removed herself from the environment and triggers that caused her to relapse. The evidence shows Mother has built a new life with a substantial support system to help her maintain her sobriety. We recognize the supreme court has held that "evidence of improved conduct, especially of short[ ]duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). However, in *J.O.A.*, the father appealing termination of his parental rights did not engage in services to address his drug abuse issues until approximately nine months after the children were removed and eight months after he signed his service plan. *See In re J.O.A.*, 262 S.W.3d 7, 15 (Tex. App.—Amarillo 2008) *aff'd as modified*,

283 S.W.3d 336 (Tex. 2009). Thus, the father in *J.O.A.* waited until the end of his legal case to engage in services and work towards sobriety.

Here, in contrast, Mother submitted to inpatient drug treatment within a month after the children were removed and the trial court heard consistent testimony from several witnesses that Mother has been sober since she entered inpatient drug treatment. If the legislature intended Mother's long history of substance abuse to automatically disqualify her from reunification with her children despite immediately addressing her drug addiction, it would not have created a legislative scheme allowing a parent one year from the date of removal to engage in services and take steps showing the parent can provide the child with a safe and stable home. In other words, it would be pointless for the Department to provide Mother with services and allow her to work towards reunification if her drug addiction prior to removal would, by itself, be sufficient to terminate Mother's parental rights.

    ix.     *Whether the Perpetrator of the Harm to the Child is Identified*

The children were born with methamphetamines in their systems. As mentioned above, the trial court heard testimony that Mother has obtained sobriety. Other than the positive nail-bed drug test—that the forensic toxicologist opined was due to environmental exposure—there is no indication that Mother's former drug addiction poses a future harm to the children.

    x.     *Willingness and Ability of the Parent to Seek Out, Accept, and Complete Counseling Services and to Cooperate with and Facilitate an Appropriate Agency's Close Supervision*

As mentioned above, Mother followed the recommendation from her psychosocial evaluation and engaged in counseling. Powell testified Mother was still engaged in counseling at the time of trial. Several witnesses testified that Mother was open, honest, and cooperative with the Department throughout the case. Powell confirmed Mother successfully completed and achieved the goals of all the services the Department asked her to engage in.

xi.     *Whether the Child's Family Demonstrates Adequate Parenting Skills and Willingness and Ability of the Child's Family to Effect Positive Environmental and Personal Changes Within a Reasonable Period of Time*

The Department sought to reunify the children with Mother pursuant to a monitored return. To support the Department's position, Powell reasoned Mother has demonstrated a "consistent effort to parent her children." According to Powell, Mother applies any suggestions the Department provides to her and she is "trying to improve upon her parenting skills and demonstrate to [the Department] a willingness to parent her children." For example, Mother provided snacks and activities for the children pursuant to Powell's suggestion. Powell suggested Mother "try to handle the children on her own" during visits and "not to depend so much on whoever's observing the visit." With the exception of one time, Powell opined Mother demonstrated the ability to take care of the children during subsequent visits. Regarding the one time Mother asked for help, Powell indicated Mother's request was reasonable because the environment "was busy[.]"

Notes from Mother's therapist were admitted into evidence and stated in the summary section that Mother appears receptive to learning new strategies on how to parent and maintain stability in the children's lives. The therapist's notes further stated changes in Mother's behaviors and conditions "demonstrate that problems contributing to risk have been or are in the process of being addressed and that the risk to children has been reduced: stability."

Again, drug abuse was the Department's primary concern at removal. Mother quickly entered inpatient drug treatment and continued to address her drug addiction and maintain sobriety throughout the case. The record reflects Mother addressed the Department's concerns with her drug addiction, obtained stable housing, consistently attended visits, completed parenting classes, continued to engage in counseling throughout the case, and has shown an ability to parent the children. The evidence shows that Mother has sufficiently shown a willingness and ability to effect positive environmental and personal change within a reasonable amount of time. Powell opined

Mother's rights should not be terminated and that a monitored return to Mother was in the children's best interests.

*xii.* *Adequate Social Support System*

The trial court heard testimony that Mother has built an extensive social support system consisting of her sister, people from her drug recovery programs, her sponsors, and her recovery coach. Powell opined Mother has complied with her service requirement to build a support system. As mentioned above, Powell testified that Mother has availed herself of resources in her new location and her recovery coach can help Mother with transportation if needed. The testimony establishes that Mother's decision to move away from her former environment resulted in a social support system that has allowed her to effect positive change and was an action that serves the children's best interests.

*D. The Evidence is Insufficient to Support Termination of Mother's Parental Rights*

"[T]ermination is not warranted 'without the most solid and substantial reasons.'" *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). In parental-termination proceedings, the petitioner's burden is not simply to prove that a parent should not have custody of her children; the petitioner must meet the heightened burden to prove, by clear and convincing evidence, that it is not in the children's best interests for them to have any legal relationship with the parent whatsoever. *See In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.).

The question before the trial court is not whether the children might have a better life in the custody of someone else, the question is whether Mother's actions are such that her relationship with her children should be forever severed. *See A.H.*, 414 S.W.3d at 807 ("[T]he best interest standard does not permit termination merely because a child might be better off living

elsewhere."). Further, it is hard to imagine that Mother's reliance on a stranger's help at a McDonald's, or Mother's reliance on the help of her support system, would justify termination of her parental rights. And, nothing in the record indicates that Mother will not care for the children's medical needs. The testimony established that Mother took the children to the doctor a collective twelve times in the two months the children were reunified with Mother. Though we defer to the trial court's assessment of credibility, and it is the trial court's province to determine the weight given to the testimony, the question of whether Mother will adequately provide for the children's medical needs does not turn on conflicting evidence. Instead, all the testimony established that Mother was providing for the children's medical needs while they were in Mother's care during the monitored return period, and she would continue to provide for their medical needs if they were returned to her again. The opinions of the witnesses may differ, but the facts do not.

The only evidence presented at trial supporting the trial court's best interest determinations was the positive nail-bed drug test. Because all other drug-related evidence presented to the trial court—including random drug testing throughout the pendency of the case and a hair and urine test taken after the positive nail-bed drug test—indicates Mother has maintained her sobriety since February 7, 2023, we cannot conclude that this singular nail-bed drug test is sufficient to establish a firm belief or conviction that termination of Mother's parental rights is in the children's best interests. Had there been no other evidence regarding Mother's sobriety, the positive nail-bed drug test may have been sufficient evidence that Mother's drug addiction continues to pose a danger to the children. But in a legal sufficiency review, we "cannot ignore undisputed evidence contrary to the finding" such as the overwhelming evidence that Mother has maintained sobriety throughout the pendency of the case. *See In re C.V.L.*, 591 S.W.3d 734, 748 (Tex. App.—Dallas 2019, pet. denied); *see also J.F.C.*, 96 S.W.3d at 266 (holding a reviewing court does not "disregard *all*

evidence that does not support [the trial court's] finding" in a legal sufficiency review because "[d]isregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence"). Moreover, the forensic toxicologist testified the positive nail-bed drug test only indicates that Mother was somehow environmentally exposed to methamphetamines. To the extent that the trial court determined the environmental exposure to methamphetamines supports termination of Mother's parental rights, we conclude that, in light of the overwhelming undisputed evidence showing Mother has maintained her sobriety, the trial court could not have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interests. *See J.F.C.*, 96 S.W.3d at 266. Thus, in light of the entire record, we conclude the evidence of the positive nail-bed drug test, standing alone, is insufficient to support the trial court's best interest finding. *See id.*

While the positive nail-bed drug test may be some evidence that termination of Mother's parental rights is in the children's best interests, it was the foster parents' burden to prove that termination is in the children's best interests by clear and convincing evidence. *See A.H.*, 414 S.W.3d at 807 ("[D]ue process and the Texas Family Code place the burden of proof on the [party seeking termination] to prove the necessary elements by the heightened burden of 'clear and convincing evidence.'"). The foster parents failed to meet that burden here.

Having reviewed the record and considered all the evidence under the appropriate standard of review, we conclude the trial court could not have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573. Accordingly, the trial court erred when it based its decision on legally insufficient evidence. Mother's sole issue is sustained.

**CONCLUSION**

We reverse the portion of the trial court's Order of Termination that terminated Mother's parental rights to the children and render judgment denying the intervenor foster parents' petition for termination of Mother's parental rights to the children. We affirm the Order of Termination in all other respects.

Irene Rios, Justice